```
            UNITED STATES DISTRICT COURT
             MIDDLE DISTRICT OF FLORIDA
                FORT MYERS DIVISION
```

VIRGIL D. ROBERTS,

      Plaintiff,

v.                          Case No: 2:17-cv-510-FtM-29MRM

CITY OF CAPE CORAL, acting
in its official capacity as
a Police Department, Lee
County, Florida,

      Defendant.

_____

**OPINION AND ORDER**

This matter comes before the Court on the defendant's Motion for Summary Judgment (Doc. #18) filed on April 25, 2018. Plaintiff filed a Response to Motion for Summary Judgment (Doc. #24) on June 5, 2018. Defendant filed a Reply Brief (Doc. #28) on June 19, 2018, with leave of Court. For the reasons set forth below, the motion is granted.

**I.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us,

Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant

summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

**II.**

In the Second Amended Complaint (Doc. #2), plaintiff Virgil D. Roberts (plaintiff or Roberts) alleges false arrest and imprisonment (Count I) and excessive force (Count II) under 42 U.S.C. § 1983 against the City of Cape Coral (defendant or the City). The undisputed facts set forth below are based on defendant's admissions in the Answer to Second Amended Complaint (Doc. #6), and the supporting documents filed by the parties.

At all relevant times, Officer Brady, Officer Goff, and Officer Correa were operating as police officers for the Cape Coral Police Department, and plaintiff and his wife, who jointly owned their residence, were going through a divorce. (Doc. #2 & Doc. #6 at ¶¶ 5-7.) On August 23, 2013, Mrs. Roberts called the Cape Coral Police Department to report a domestic dispute with plaintiff. Officers Brady and Goff responded, and interviewed or questioned plaintiff inside the house. Officer Correa arrived at the scene, and interviewed or questioned Mrs. Roberts outside the house. (Id. at ¶¶ 10, 11, 13, 14.) Plaintiff was ultimately arrested at the residence pursuant to Fla. Stat. § 784.08 for battery on a person 65 years of age or older. (Id. at ¶ 4; Doc. #25-2, p. 1.) After a jury trial, plaintiff was not convicted. The Officers acted within the scope of their employment with the City of Cape Coral

Police Department at all relevant times. (Doc. #2 & Doc. #6 at ¶¶ 22, 23.)

During trial[1], Officer Brady testified that he was the first officer to arrive at the residence, and that Officer Goff came in afterwards. Mrs. Roberts was outside the residence on the front walkway. After having a "brief exchange" with her, Officer Brady announced himself and entered the residence, and eventually found plaintiff inside. (Doc. #25-1, pp. 3-4.) Officer Brady asked him if he was okay, and whether he needed medical attention, to which plaintiff responded in the negative. (Id., p. 4.)

Officer Correa was the second Officer to arrive on the scene, after Officer Brady, and interviewed Mrs. Roberts outside the residence. (Doc. #18-1, pp. 8-9.) Mrs. Roberts provided a sworn statement to Officer Correa as follows:

> I came home from getting work done an [sic] my car & came into the house & started to eat lunch when my husband (Virgil [ ]) came inside & started to yell at me why hadn't I picked up 3 pieces of dog food that were on the floor. I told him I would do it later when he grabbed me by the head & pushed my head down to the floor. While doing this he was yelling for me to get over there & pick up the dog food. Once he released me I picked up the dog food & called 911. I am afraid for my safety & the safety of my pets.

---

[1] No deposition for Officer Brady was attached by either party. Plaintiff submitted an excerpt from the trial testimony, and states that he could not locate Officer Brady to reset his deposition after Hurricane Irma. (Doc. #24, p. 4.)

4

> I want to press charges against Virgil Roberts for hitting me.

(Doc. #18-2.)

Inside the house, Officer Brady spoke with plaintiff and could see that plaintiff was angry and tense. (Doc. #25-1, pp. 4-5.) Plaintiff stated that the argument was over some dog food on the floor, and he was surprised that the police were present since it was just a "verbal argument."[2] (Id., p. 5.) Officer Goff, who joined Officer Brady inside the house, states that plaintiff became agitated in explaining the incident and said "I told her she was going to pick up that fucking dog food." (Doc. #18-5.)

During the conversation, Officer Correa came in and listened to the Officers talking to plaintiff, and then confronted plaintiff with what Mrs. Roberts told her. (Doc. #25-1, p. 6.) Plaintiff started getting angry, waving his arms, and cursing at Officer Correa. (Id., pp. 6-7.) Contrary to Officer Correa's statements, plaintiff states that Officer Correa came into the house at least

---

[2] Plaintiff states that he yelled at Mrs. Roberts, but did not touch her:

> And I said, "Look, you fat ass," I said, "Get your fat ass out of that chair and I want this dog food cleaned up and I want it cleaned up right now." And I -- and I said, "That's the end of it." I said, "I'm tired of this bullshit." And I says, "You're not pulling this stuff on me." I said, "I want this stuff cleaned up."

(Doc. #18-3, p. 65.)

5

three times asking the same question. (Doc. #18-3, pp. 76-77, 81.) Plaintiff started getting upset after the repeated questioning, and said "you've asked that question three times and I gave you three answers that are all the same. I'm telling you, she's [Mrs. Roberts] lying and I'm not answering that question anymore." (Id., pp. 81, 82.) When Officer Correa left, the front door closed behind her loudly, which infuriated plaintiff. (Doc. #25-1, p. 7.) Plaintiff started cursing "You're not going to slam my door", and he started taking a few steps towards the front door. (Id.) Officer Goff heard plaintiff make a comment along the lines of "[Officer Correa] is not going to come in my house and slam my fucking door", and [plaintiff] started to go after Officer Correa. (Doc. #18-4, p. 14.)

Officer Brady placed handcuffs on plaintiff for officer safety because it was unclear what plaintiff might do next. (Doc. #25-1, p. 7.) Officer Goff assisted Officer Brady in securing the handcuffs on plaintiff. (Doc. #18-5.) Plaintiff placed his hands behind his back, and Officer Brady applied the handcuffs without any issues. Officer Goff did not discuss the arrest with Officers Correa and Brady after he left the residence, and he went straight home. (Doc. #18-4, p. 15.)

During the handcuffing process, Officer Brady did not touch plaintiff anywhere other than his wrists, and plaintiff did not complain that the handcuffs were too tight or that they caused

6

pain to the wrists. (Doc. #18-3, pp. 88, 121.) Plaintiff states that he was not permitted to put shoes on, but did not require any medical treatment as a result of walking to the patrol car. (Id., p. 89.) Officer Brady had to assist plaintiff with getting his legs into the patrol car because of the handcuffs, and in doing so he grabbed plaintiff's left arm. Plaintiff asserts that during this process, Officer Brady injured his shoulder. (Id., pp. 91, 93.) Plaintiff states that "he" grabbed his arm and jerked on it until he broke the tendon going down to his bicep muscle according to a Dr. Martinez. (Id., p. 52.) Medical records were not available. (Id., pp. 53-54.)

During transport, plaintiff complained about the air conditioning not working in the back of the patrol car. Plaintiff did not ask for treatment for heat exhaustion or overheating once he arrived at Lee County Jail, just a drink of water, which he received "reluctantly." (Id., p. 95.) After leaving jail, plaintiff did not seek treatment or receive treatment for any injury related to his wrists, or for heat-related ailments. (Id., pp. 95-96.) About a year later, plaintiff sought treatment for an injured shoulder. (Id., p. 96.) Plaintiff did not have any out of pocket fees for medical treatment on his shoulder. (Id., p. 112.) Plaintiff has not sought the care of any psychologist, psychiatrist, counselor, or therapist. (Id., p. 114.) Plaintiff is claiming emotional distress but did not seek treatment, and he

did not start any medication for anxiety or stress, or require anything to fall asleep. (Id., p. 115.) Plaintiff states he was in a very hot car for 30 minutes, sweating, but he was not burned in any way. (Id., pp. 117-118.) Officer Brady "started the engine and then turned it on" when he was sitting in the car working on his laptop computer. (Id., p. 118.) Plaintiff stated no further plans to see any medical doctors for any injuries arising from the incident other than a scheduled shoulder surgery. (Id., p. 149.)

## III.

Section 1983 allows a citizen who has been subjected to a "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," by any person acting under the color of state or federal law to bring suit against that person. 42 U.S.C. § 1983. "By its terms, of course, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).

Municipalities cannot be held liable on a theory of vicarious liability for violations by its officers, and plaintiff must prove that the City had a policy, custom, or practice that caused the deprivation. Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016); Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 692-693 (1978). "Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether

8

there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989). Additionally, to impose liability, plaintiff must show that his constitutional rights were violated, and that "the municipality had a custom or policy that constituted deliberate indifference to that constitutional right." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). See also Martin v. Wood, 648 F. App'x 911, 914 (11th Cir. 2016). This deliberate indifference may be established by evidence that the municipality had notice and knew of a need to train and/or supervise in a particular area, and that the municipality made a deliberate choice not take action. Gold v. City of Miami, 151 F.3d 1346, 1350, 1351 (11th Cir. 1998) (citations omitted).

If plaintiff does not challenge an official policy or custom, "he must show that the alleged violation of his constitutional rights was caused by an unofficial practice or custom that is persistent and wide-spread." Carter v. Columbus Consol. Gov't, 559 F. App'x 880, 881 (11th Cir. 2014) (citing Depew v. City of St. Marys, 787 F.2d 1496, 1499 (11th Cir. 1986)). The practice or custom must be "so pervasive as to be the functional equivalent of a formal policy." Carter v. Columbus Consol. Gov't, 559 F. App'x 880, 881 (11th Cir. 2014) (citing Grech v. Clayton Cnty., 335 F.3d 1326, 1330 n.6 (11th Cir. 2003)).

### A. False Arrest and Imprisonment (Count I)

In Count I, plaintiff alleges that he had a clearly established constitutional right to be free from any unreasonable seizures, and that on or about August 23, 2013, the Cape Coral Police Department caused him to be unlawfully detained, and deprived him of his liberty and freedom of movement pursuant to the Police Department's policy, custom, and practice of arresting persons without probable case, "and the de facto policies, customs and practices of such arrests being sustained on the ability to imagine and write up pre-textual narratives." (Doc. #2, ¶ 30.) Plaintiff alleges that the Police Department condoned and supported the practices of the above officers "who falsely arrested individuals for alleged 'loitering and prowling,'" on the day in question. "The Department implemented a policy, custom, or practice of allowing Department's officers to make false arrests and to detain persons without probable cause by using the veneer of loitering and prowling to paper over unconstitutional detentions." (Id., ¶ 31.)

No factual or evidentiary support of a pattern, practice, or custom was provided in response to summary judgment, and for the new allegation in the Response of gender-profiling for arrests in domestic violence cases, "or, in other words anti-men, gender-bias in complaints of domestic violence." (Doc. #24, pp. 1-2.) Plaintiff questions an arresting officer's discretion to arrest

the male participant based solely on the allegation of the female participant. (Id., p. 2.)

A warrantless arrest without probable cause is a basis for a § 1983 claim, as well as detention on the basis of the false arrest. Ortega v. Christian, 85 F.3d 1521, 1525 & 1526 (11th Cir. 1996). However, the existence of probable cause at the time of arrest is an absolute bar to a constitutional challenge. Martin v. Wood, 648 F. App'x 911, 915 (11th Cir. 2016) (citing Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010)).

> An officer has probable cause for an arrest when the arrest is "objectively reasonable based on the totality of the circumstances." Wood v. Kesler, 323 F.3d 872, 878 (11th Cir. 2003). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Id.

Vickers v. Georgia, 567 F. App'x 744, 746 (11th Cir. 2014). "Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action." Brown v. City of Huntsville, Ala., 608 F.3d 724, 737 (11th Cir. 2010).

Plaintiff was initially detained by Officer Brady for reasons of officer safety, and ultimately booked and provided a notice to

appear for violation of Florida Statute 784.08(2)(c), which states:

> Whenever a person is charged with committing an assault or aggravated assault or a battery or aggravated battery upon a person 65 years of age or older, regardless of whether he or she knows or has reason to know the age of the victim, the offense for which the person is charged shall be reclassified as follows:
>
> . . .
>
> (c) In the case of battery, from a misdemeanor of the first degree to a felony of the third degree.

Fla. Stat. § 784.08(2)(c). The detention based on officer safety was unrelated to the ultimate charge based on the statement of Mrs. Roberts. The allegation that plaintiff intentionally caused harm to Mrs. Roberts, supported by her sworn statement, would provide a prudent person under the same circumstances a reasonable basis to believe that a crime had been committed.[3] "Thus, while a police officer should consider a suspect's explanation in evaluating the existence of probable cause, he is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially

---

[3] As noted by defendant in its Reply, an officer may rely on a victim's complaint in support of probable cause. See Bijou v. Rambosk, No. 2:14-CV-517-FTM-29MRM, 2015 WL 5952906, at *4 (M.D. Fla. Oct. 13, 2015).

discovered provide probable cause." Bijou, 2015 WL 5952906, at *4 (citation omitted).

In this case, the detention was made in the discretion of the arresting officer based on the circumstances known to him at the time, including plaintiff's agitation, language, and anger, which led him to believe that plaintiff was pursuing Officer Correa in a way that threatened officer safety. "The Court has long recognized that officer safety is a concern whenever officers and arrestees or potential arrestees are in close proximity." McClish v. Nugent, 483 F.3d 1231, 1261 (11th Cir. 2007) (Anderson, J., concurring). There is nothing in the record to dispute or contradict the objectively reasonable actions of Officer Brady. With probable cause to arrest, there can be no constitutional violation. Summary judgment will be granted as to Count I.

**B. Excessive Force (Count II)**

In Count II, plaintiff alleges that the officers unlawfully authorized plaintiff's arrest without probable cause that plaintiff had committed a crime for the improper motivation of teaching him a lesson. (Doc. #2, ¶ 40.) Plaintiff alleges that he was placed in the patrol car by officers, spun around and slammed against the car door, and cuffed behind his back in a manner that injured his shoulder. (Id., ¶ 42.) Plaintiff alleges that the circumstances indicated no crime, nor was plaintiff displaying any kind of provocation or threats, yet he was placed

13

in the car for an extended period of time without air conditioning or open windows when the outside temperature was in the 90s. (Id., ¶ 43.) Plaintiff alleges that this use of excessive force was a pattern and practice or custom of the Police Department. (Id., ¶ 45.) Plaintiff alleges that the Police Department was aware of various lawsuits complaining that its officers used excessive force on other arrestees in circumstances not warranting such use of force, and that these lawsuits demonstrate a pattern and practice of the Police Department impermissibly training its officers to make arrests in circumstances where it is "objectively apparent" that no law has been broken. (Id., ¶ 46.)

Again, no factual or evidentiary support was submitted of a pattern, practice, or custom in response to summary judgment. Plaintiff seems to allege a general pattern of excessive force against arrestees by failing to provide air conditioning in patrol vehicles at all times. Excessive force is established through a "reasonableness inquiry":

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [ ]
>
> . . . .
>
> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

> amount of force that is necessary in a particular situation.
>
> . . .
>
> [T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

Graham v. Connor, 490 U.S. 386, 396-397 (1989) (internal citations omitted). "'[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002) (quoting Graham, 490 U.S. at 396). Painful handcuffing, without more, is not excessive if resulting injuries are minimal. Id., at 1351. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." Penley v. Eslinger, 605 F.3d 843, 851 (11th Cir. 2010) (quoting Tennessee v. Garner, 471 U.S. 1, 11 (1985) (noting that this is the case even where an officer uses deadly force merely to prevent the suspect's escape)).

No evidence is presented in plaintiff's deposition that he suspected or had reason to believe that Officer Brady knew he had some preexisting injuries that could have been exacerbated. The facts above reflect that Officer Brady applied the handcuffs without any issues, and Officer Goff did not touch plaintiff.

15

Officer Brady did not touch plaintiff anywhere other than his wrists, and plaintiff did not complain about the handcuffing. Officer Brady had to assist plaintiff with getting into the car, and in doing so, plaintiff states that Officer Brady jerked on his arm until he broke the tendon going down to his bicep muscle, but no medical records of diagnosis or treatment were provided. Plaintiff did not complain at the time of arrest, during transport, or upon arrival at the Lee County Jail. During transport, plaintiff complained about the air conditioning not working in the back of the patrol car but suffered no repercussions. About a year later, plaintiff sought treatment for an injured shoulder, and had no out of pocket medical expenses.

Based on the facts of the arrest, coupled with plaintiff's behavior leading up to the arrest and handcuffing of plaintiff, a reasonable officer in the same position would likely have taken the same actions. There is nothing objectively unreasonable with arresting an individual who may pose a threat to a fellow officer, or where probable cause has been established based on the sworn statement of a victim. The process was not excessive. Summary judgment will be granted as to Count II.

Accordingly, it is now

**ORDERED:**

1. Defendant's Motion for Summary Judgment (Doc. #18) is **GRANTED** in favor of defendant on all counts, and Plaintiff shall take nothing.

2. The Clerk shall enter judgment accordingly, terminate all pending motions and deadlines as moot, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __13th__ day of September, 2018.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of record